IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ABBEY N EARL, | ) | CASE NO. 1:19CV439 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | ) ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Abbey Earl ("Earl") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 12.

For the reasons explained below, the Commissioner's decision is **AFFIRMED**.

**I. Procedural History**

Earl filed applications for DIB and SSI on July 24, 2015, alleging a disability onset date of December 11, 2008. Tr. 15. She alleged disability based on the following: diverticulitis, celiac disease, c. difficile, stomach infections, bipolar, colitis, ulcers, auto immune disease, depression, anxiety, and OCD. Tr. 315. After denials by the state agency initially (Tr. 305, 306) and on reconsideration (Tr. 347, 348), Earl requested an administrative hearing. Tr. 375. A hearing was held before an Administrative Law Judge ("ALJ") on October 12, 2017. Tr. 42-72. In his April 20, 2018, decision (Tr. 15-35), the ALJ determined that there are jobs in significant numbers in the national economy that Earl can perform, i.e., she is not disabled. Tr. 33-34. Earl

1

requested review of the ALJ's decision by the Appeals Council (Tr. 422) and, on December 27, 2018, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Earl was born in 1985 and was 23 years old on her alleged onset date. Tr. 33. She has at least a high school education and completed two years of college. Tr. 476. She previously worked as a bartender, cashier, cook, pre-school teacher, receptionist, retail sales associate, and car salesperson. Tr. 476.

### B. Relevant Medical Evidence[1]

The first mental health treatment note in the record is from a behavioral intake in January 2016, when Earl saw Certified Nurse Practitioner Felicia Fior-Nossek. Tr. 2031. Earl reported that she had been hostile and anxious and stated that, when she is not on her medication, she is not able to function. Tr. 2031. She said that she had been off some of her medication for three weeks—she was only taking Klonopin and Zoloft— and she was not doing well. Tr. 2031. Her mood was depressed and irritable and her anxiety was "off the charts." Tr. 2031. She did not want to leave the house and she felt overwhelmed. Tr. 2031. She endorsed a history of manic episodes and panic attacks. Tr. 2031. She endorsed obsessive thoughts, compulsive behaviors (cleaning and order) that interrupted her daily life. Tr. 2032. Upon exam, she was neatly dressed and groomed, with good eye contact and normal posture and gait. Tr. 2034. She was cooperative and appropriately verbal, had coherent thoughts and organization, was easy to follow, and had a normal rate, flow and prosody of speech. Tr. 2034. Her thought processes

---

[1] Earl only challenges the ALJ's decision with respect to his treatment of the opinion of state agency psychologist Dr. Haskins. Accordingly, only the mental health treatment notes are summarized and discussed herein.

2

were goal directed and associations logical. Tr. 2034. She had no hallucinations or delusions, no evidence of pathological traits, and no paranoia. Tr. 2035. Her mood was moderately depressed and she was moderately anxious. Tr. 2035. She was alert and oriented to person, place and time, her attention and concentration were intact, and her memory good. Tr. 2035. She had a limited capacity for insight, her fund of knowledge was within normal limits, and she reported obsession and compulsions with cleanliness and germs. Tr. 2035. Her medications were adjusted. Tr. 2036-2037.

In February 2016, Earl returned to Fior-Nossek for a medication follow up. Tr. 2027. Earl indicated that she was able to handle stressors now that she was on her medications. Tr. 2027. Her mood was depressed but less irritable; she was not lashing out anymore and her anxiety had improved to the extent that she had decreased her Klonopin to twice a day. Tr. 2027. She did not want to leave the house due to her gastrointestinal issues, not due to anxiety. Tr. 2027. Upon exam, she had good eye contact, was cooperative and appropriately verbal, had normal speech and coherent and organized thoughts, and she was goal-directed with normal associations. Tr. 2028. She had a mildly depressed mood, a blunted affect, a limited capacity for insight, intact attention and concentration, and a good memory. Tr. 2028. Her medications were adjusted and she declined psychotherapy. Tr. 2029.

In April 2016, Earl returned to Fior-Nossek for a follow up. Tr. 2022. Earl reported feeling "really good," her mood had not been depressed since restarting her medications, and stated that "others have noticed a huge difference." Tr. 2022. Her thoughts were clearer, her behavior was calmer, and she had some OCD issues. Tr. 2022. Her anxiety had improved and she had decreased her Klonopin to once a day. Tr. 2022. Her objective exam findings were the same as her prior visits, except that her mood was not depressed, she was mildly anxious, and

she had grandiose thoughts. Tr. 2023.

Earl next saw Fior-Nossek in July 2016. Tr. 2017. She reported that her anxiety had been "over the top." Tr. 2017. She had an increased depressed mood and anxiety and she was not sleeping well. Tr. 2017. Upon examination, her findings were the same as her prior visit, except she had moderate anxiety and depression. Tr. 2017-2018. Her attention and concentration were still intact and her memory was good. Tr. 2018. Her medications were adjusted. Tr. 2019.

Earl returned in August 2016 for a follow-up. Tr. 2012. She reported having increased depression and anxiety, being angry, not sleeping well, and she did not like crowds and did not want to leave the house. Tr. 2012. Her exam findings were as her prior visit: she was neatly dressed and groomed, had good eye contact, and was cooperative and appropriately verbal. Tr. 2012. She had coherent thoughts and organization, was easy to follow, and her speech had a normal rate, flow and prosody. Tr. 2012. She had goal directed thought processes, logical associations, and grandiose thoughts. Tr. 2012. She had no hallucinations and denied suicidal and homicidal ideation, intent, or plan. Tr. 2012-2013. She was alert to person, place, and time, her attention and concentration were intact, and her memory was good. Tr. 2013. Her medications were adjusted. Tr. 2014.

In November 2016, Earl saw Fior-Nossek for a follow-up visit. Tr. 2008. Earl reported that she was not depressed, she was taking care of herself, she was in a healthy relationship, she was sleeping well, and she was much calmer. Tr. 2008. She had difficulty in big crowds but was able to leave the house. Tr. 2008. She was going to work for an insurance company once a month. Tr. 2008. Upon exam, she had a "much improved mood," was not depressed, was less anxious, and had a full affect. Tr. 2008-2009. She did not have grandiose thoughts and her other

findings were as they had been in prior visits. Tr. 2008-2009. Her medications were adjusted. Tr. 2010.

Earl saw Fior-Nossek next in January 2017. Tr. 2001. She was doing "very well," her mood was "much improved" and not depressed, and she was taking care of herself. Tr. 2001. She was calmer, sleeping well, and stated that she was in a healthy relationship. Tr. 2001. Her exam findings were normal: she was neatly dressed and groomed, had good eye contact and normal posture and gait, she was cooperative and appropriately verbal, she had coherent thoughts and organization that were easy to follow, and she had a normal rate, flow and prosody of speech. Tr. 2002. Her thought processes were goal directed and her associations were logical, she had no hallucinations, no depersonalization or derealization, no delusions or paranoia, no obsessions, compulsions, or phobia, and no suicidal or homicidal ideation, intent or plans. Tr. 2002-2003. Her affect was expressive and appropriate to content with a full range, her mood was within normal limits and euthymic, she had good insight and judgment, she was alert and oriented to person, place and time, her attention and concentration were intact, and her memory was good. Tr. 2003.

**C. Opinion Evidence**

**1. Consultative Examiner**

In November 2015, Earl saw Charles Loomis, M.Ed., for a consultative psychological examination. Tr. 1178. Loomis observed that Earl was pleasant and cooperative, she interacted with him appropriately, her attention, pace and persistence were adequate during the interview, and eye contact was maintained. Tr. 1181. Her speech was normal, her mood was unremarkable, and her affect was largely appropriate. Tr. 1181. She had an erratic energy and was mildly anxious. Tr. 1181-1182. She was oriented to person, place, date and situation;

5

unable to recall any of three objects after five minutes; able to remember six digits forward and five digits backwards; and received credit on one of the arithmetic problems presented. Tr. 1182. Her concentration and attention to tasks, immediate and delayed memory functions and computational abilities were within average limits, she presented with a good fund of general information, reasoning and practical solving abilities, and her functional intelligence was estimated to be in the average range. Tr. 1182. Her judgment for making important decisions caring for her household, managing her personal and financial affairs, and participating in treatment appeared adequate. Tr. 1183. Loomis opined that Earl's ability to understand, remember and carry out instructions was not significantly limited, her ability to maintain attention and concentration was near average, she appeared to have no significant impairment dealing with ordinary social demands in a work setting, and she had no significant limitation responding to work pressures in a work setting. Tr. 1184-1185.

**2. State Agency Reviewing Psychologists**

In November 2015, state reviewing psychologist Todd Finnerty, PsyD., reviewed Earl's records and opined that she could understand and remember simple work instructions and sustain concentration and persist in simple, unskilled work tasks. Tr. 300. She could interact occasionally in situations that do not require persuasion or frequent contact with the general public and adapt to a static setting without frequent changes. Tr. 301.

In April 2016, state reviewing psychologist Kristen Haskins, PsyD, reviewed Earl's records and opined that she was not significantly limited in any area under the concentration, persistence category, including pace; she could interact occasionally in situations that did not require persuasion or frequent contact with the general public; and she could adapt to a static setting without frequent changes or stringent time or production demands and would need major

6

changes to a set work routine explained in advance and slowly implemented to allow her time to adjust to the new expectations. Tr. 342-343.

### E. Testimonial Evidence

#### 1. Earl's Testimony

Earl was represented by counsel and testified at the administrative hearing. Tr. 44. When asked why she believes she would not be able to perform her past work, Earl described her daily routine of waking up, taking her medication, worrying about how many times she will have to use the restroom, and not eating because she doesn't know how her body is going to react. Tr. 58. Due to her C. diff (clostridium difficile), which is highly contagious, she is paranoid about washing her hands thoroughly and the cleanliness of her bathroom. Tr. 59. She has high anxiety about what is going to happen throughout the day. Tr. 59. She sees Fior-Nossek, a mental health nurse. Tr. 62. Earl agreed with her attorney that, due to her problems, she would not be physically or mentally available to perform even an unskilled job. Tr. 67.

#### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing. Tr. 86-89. The ALJ discussed with the VE Earl's past work as a salesperson, receptionist, and cashier, and asked the VE to determine whether Earl could perform her past work or any other work if she had the limitations assessed in the ALJ's RFC determination. Tr. 67-69. The VE answered that such an individual could not perform Earl's past work but could perform other work in the national economy such as inspector and hand packager, assembler of plastic hospital parts, and assembler of electrical accessories. Tr. 69-70.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the

existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In his April 20, 2018, decision, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2014. Tr. 18.

2. The claimant has not engaged in substantial gainful activity since December 11, 2008, the alleged onset date. Tr. 18.

3. The claimant has the following severe impairments: diverticulitis with perforation; anxiety disorder; panic disorder; bipolar 1 disorder; depression; obsessive compulsive disorder. Tr. 18.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 19.

5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except no climbing of ladders, ropes or scaffolds, occasional stooping, kneeling, crouching, and crawling. She is limited to performing simple tasks and following simple instructions, only occasional interaction with the general public, with few if any work place changes. Tr. 21.

6. The claimant is unable to perform any past relevant work. Tr. 33.

7. The claimant was born in 1985 and was 23 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. Tr. 33.

---

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

8. The claimant has at least a high school education and is able to communicate in English. Tr. 33.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. Tr. 33.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. Tr. 33.

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 11, 2008, through the date of this decision. Tr. 34.

**V. Law & Analysis**

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

Earl argues that the ALJ did not properly consider the opinions of state agency reviewing psychologist Dr. Haskins. Doc. 13, p. 7. She complains that the ALJ found that she had moderate limitations in concentration, persistence and pace at step three but did not account for any limitation for stringent time or production demands in his RFC assessment, despite Dr.

Haskins' opinion that Earl needed a work setting without stringent time or production demands. Doc. 13, pp. 8-9. In support, Earl relies on *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516-517 (6th Cir 2010). Doc. 13, pp. 7-8.

In *Ealy*, the ALJ had found that the claimant had moderate limitations in concentration, persistence and pace, relying on a state agency reviewer's opinion that also found the claimant limited to completing simple, repetitive tasks of two-hour segments where speed was not critical. 594 F.3d at 516. The court found that the ALJ erred because the ALJ failed to include the two-hour segments and critical speed limitations in the RFC and the hypothetical posed to the VE. *Id*. Notably, the ALJ in *Ealy* had stated that his RFC assessment was consistent with the state agency reviewer's opinion. *Id*., n.4.

Here, the ALJ explained,

> The undersigned gives great weight to the state mental consultants who opined the claimant had limitations in understanding and memory, sustained concentration and persistence, and social interaction, as well as her ability to adapt [to] limitations. These consultants did not have the full record, or the claimant, to examine; however, this opinion is generally consistent with the record as a whole, including indications of a cooperative, pleasant, individual, with good mood and affect, as well as intact memory, concentration, and attention. It is further consistent with the claimant's allegations as to concentration difficulty and social dysfunction.

Tr. 31.

In contrast to the facts in *Ealy*, the ALJ in this case did not state that his RFC assessment was consistent with Dr. Haskins' opinion. Rather, the ALJ gave great weight to both state agency psychologists' more general opinion that Earl had "limitations" in understanding and memory, sustained concentration and persistence, social interaction, and ability to adapt. The ALJ's RFC reflects limitations in these areas of functioning. The ALJ, not a physician, is responsible for assessing a claimant's RFC. *See* 20 C.F.R. § 404.1546 (c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. App'x 149, 157 (6th Cir. 2009); *Reeves v. Comm'r of Soc. Sec.*, 618 Fed.

11

App'x 267, 275 (6th Cir. 2015) ("Even where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale.").

Earl's reliance upon the rule in *Ealy* is also misplaced because, as Earl emphasizes, *Ealy* specifically involved a state agency reviewer's limitation regarding concentration, persistence and pace. Doc. 13, pp. 7-8; Doc. 16, pp. 1. Here, however, Dr. Haskins specifically found that Earl was "not significantly limited" in any category regarding her ability to sustain concentration and persistence and her ability to perform at a consistent pace. Tr. 342-343. Rather, Dr. Haskins, under the subheading "adaptation limitations," found that Earl can adapt to a static setting without frequent changes or stringent time or production demands. Tr. 343. The ALJ included a limitation that Earl can perform work with few if any workplace changes, having generally given weight to both state agency reviewers' opinions that Earl had limitations in her ability to adapt. Tr. 21. Thus, Earl's argument that the ALJ erred by not including a pace-based restriction regarding her ability to concentrate and maintain attention based on Dr. Haskins' opinion fails.

Finally, elsewhere in his decision, the ALJ relied on consultative examiner Loomis' observation that Earl's attentional pace and persistence were adequate during her exam. Tr. 27. And the ALJ repeatedly stated that the record as a whole showed Earl to be a cooperative, pleasant individual with intact memory, concentration, and attention. Tr. 26-32. Earl does not challenge any of these findings by the ALJ.

In sum, the ALJ did not run afoul of the rule in *Ealy* and substantial evidence supports his decision.

## VI. Conclusion

For the reasons set forth herein, the Commissioner's decision is **AFFIRMED**.

IT IS SO ORDERED.

Dated: January 23, 2020

*/s/ Kathleen B. Burke*
Kathleen B. Burke
United States Magistrate Judge